**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **AMERICAN SIGNATURE, INC.,** | : | |
| | : | **Case No. 2:12-cv-00601** |
| **Plaintiff,** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **v.** | : | |
| | : | |
| **EXTREME LINEN, LLC,** | : | **Magistrate Judge Abel** |
| | : | |
| **Defendant.** | : | |

**OPINION & ORDER**

## I.      INTRODUCTION

This matter is before the Court on Plaintiff American Signature, Inc.'s Motion for

Summary Judgment (Doc. 64).  Plaintiff moves for summary judgment in their favor on

Defendant Extreme Linen, LLC's counterclaims for breach of contract and promissory estoppel.

(Doc. 64).  Plaintiff also requests a declaration that it has no liability to Defendant for the

disputed goods at issue in this matter.  (Doc. 64 at 1).

For the reasons set forth herein, Plaintiff's Motion is **GRANTED IN PART and**

**DENIED IN PART**.

## II.      BACKGROUND

### A.      Factual Background

Plaintiff American Signature, Inc. ("ASI" or "Plaintiff") is a furniture company based in

Columbus, Ohio that operates Value City and American Signature stores across the Eastern,

Southern, and Midwestern United States.  (Doc. 64 at 8).  Plaintiff sells bedroom, living room,

and dining room furniture, but also sells some "accessories."  (*Id*.).  Defendant, Extreme Linen

("EL" or "Defendant"), is a consumer goods company based in New York that sources top-of-

1

bed products directly from Chinese factories.   At issue in this case is the component of ASI's accessory business known as "top-of-bed," which consists of comforters and pillows used to dress the bedroom sets sold at Plaintiff's stores.  (*Id*. at 8-9).  According to Plaintiff, ASI has always sold top-of-bed products on a "drop-ship" basis, meaning the customer purchases the item from a store, but, instead of taking the item home at the time of purchase, the vendor ships the product directly to the consumer's home.  (*Id*. at 9).

In the Spring of 2012, ASI began considering a transition from a drop-ship program to an "inventory-based" program, otherwise known as a "cash-and-carry" model.  Under a cash-and-carry model, ASI would carry a number of top-of-bed accessories in its retail stores, available for purchase.  (*Id*.).  Plaintiff claims that a shift from a drop-ship program to a cash-and-carry program would constitute "a dramatic shift in concept for ASI."  For that reason, ASI claims that it intended to, and did, conduct due diligence with a number of potential vendors to assess the viability of [a cash-and-carry] program."  (*Id*.).

### 1.    *Relationship with EL - Plaintiff's Perspective*

Although ASI and EL had never conducted any prior business, ASI considered Defendant a potential vendor for top-of-bed products.  (*Id*.).  ASI employee Jennifer Martin, an ASI associate buyer at the time, knew of EL based on her previous employment with Jeff Brooks, who was an EL employee.  (*Def. Mem. In Opp.*, Doc. 72 at 3).  According to Plaintiff, Martin contacted Brooks in the spring of 2012, "advised [him] of ASI's ongoing review" of a cash-and-carry program, and "inquired whether Defendant was interested in presenting a top-of-bed proposal."  (*Id*.).  Martin said "let me know when you can make a visit asap" and informed Brooks that "my boss said 'get him in here quick.'"  (Doc. 72 at 8; Doc. 73 at 10).

Defendant asserts that in April 2012, "Mr. Brooks provided Ms. Martin with photos and prices for some of EL's top-of-bed products.  (Doc. 72 at 8).  Brooks also explained that EL would "customize" the top-of-bed products for what was "best suited for [ASI's] customers." (*Id.*).  Plaintiff claims that, "at all times" Defendant knew ASI was in the process of evaluating a shift from a drop-ship to a cash-and-carry model.  (*Id.*; Doc. 64-3 at 46).

At the time, Steve Nicewicz was ASI's internal "buyer" whom EL employees met and communicated with on occasion.  Martin was Nicewicz's assistant.  Plaintiff insists that neither Nicewicz nor Martin is authorized to contract on behalf of ASI.  (*Id.* at 10).  In fact, Plaintiff claims that ASI maintains a formal, internal "sign-off" process that must take place before any goods can be purchased.  Plaintiff describes its sign-off process as follows:

> Under this [sign-off] process, an internal buyer, such as Mr. Nicewicz, will present a proposed good to the Executive Committee for consideration…Before the Executive Committee, the buyer is to make a presentation which will include a final sample reflecting the exact good that the buyer is proposing ASI purchase and a "set-up sheet."
>
> …
>
> At the conclusion of the buyer's presentation, each person on the Executive Committee has three options: sign off on the set-up sheet in the top right-hand corner… thus authorizing the purchase to proceed; request more information, thus deferring a decision; or reject any or all of the proposals made by the buyer. If each member of the Executive Committee signs off on a good, the set-up sheet is then forwarded to the planning department. The planning department then analyzes the current inventory to determine whether there is a need for additional goods in that category. If there is need for a specific good that has already been approved by the Executive Committee, the planning department will write an order for the goods. Then, an electronic purchase order for the good is transmitted electronically to the vendor through ASI's [electronic] purchase order system for the vendor's acceptance. Once a vendor is issued a purchase order, it can elect to accept, reject or counter the purchase order and its standardized terms.

Doc. 64 at 10-11 (internal citations omitted).  At that time, ASI's Executive Committee consisted of Jonathan Schottenstein, Brian Woods and Steve Rabe.

### 2.    EL and ASI's First Meeting

On or around May 6, 2012, Brooks and Meshulem Gelman, an EL owner, met with ASI's Martin and Nicewicz at ASI's corporate offices in Columbus, Ohio.  According to Plaintiff, the purpose of this meeting was to allow Defendant to "show ASI its capabilities."  (Doc. 64 at 11; Doc. 72 at 9).  At the meeting, Defendant's representatives presented a variety of products, including "some from market…and some from other lines Defendant had previously developed." (*Id*.).

The parties' views on how this meeting went vary drastically.  Plaintiff claims that "[n]othing Defendant presented was acceptable" and that "Mr. Nicewicz was displeased by the lower-end products presented."  Plaintiff believes that the meeting ended with an agreement that Defendant would have the opportunity to submit samples for ASI's consideration.

Defendant, on the other hand, asserts that Gelman met with Martin and Nicewicz in Columbus on May 9, 2012.  According to Defendant, during the meeting, Nicewicz explained that: (a) ASI had decided to shift to a cash-and-carry model from the drop-ship model previously used; (b) ASI's target delivery date was September 1, 2012 and had a "sense of urgency attached to it";  and (c) ASI would need quantities of "approx. 1300 per pattern."   (Doc. 72 at 9). Defendant also claims that "Mr. Nicewicz stated that he was impressed and wanted EL to come back with more products," and so the parties scheduled a meeting for the following week.  (Doc. 72 at 9 citing Gelman Dep. 64-65; Deposition of Steven Nicewicz at 95).

### 3.    EL and ASI's Second Meeting

On or about May 15, 2012, EL representatives again traveled to Columbus, "this time with a tractor-trailer full of samples."  (Doc. 64 at 11).  Defendant was given access to ASI's "lab store" – a warehouse in the basement of ASI's corporate offices used to display items being

considered for purchase – to dress a number of beds for display during the meeting and tour scheduled to take place the next day.  (Doc. 64 at 11-12; Doc. 72 at 9).  Defendant states that Nicewicz introduced EL to Jonathan Schottenstein, ASI's President, and Brian Woods, then Executive Vice President of Merchandising.  (Doc. 72 citing Woods Dep. 59; Gelman Dep. 89-90).

The next day, May 16, 2012, Nicewicz toured the lab store with EL's representatives. Defendant claims that, at this meeting,  "EL met with Mr. Nicewicz, Ms. Martin, Jonathan Schottenstein, Jay Schottenstein, Bradley Hoffman, and Angela Haddox" and that "[v]arious other ASI personnel – including Messrs. Rabe, Woods and Robert Grimmett – walked through EL's TOB displays."  (Doc. 72 citing Gelman Dep. 92; Nicewicz Dep. 96).  Again, the parties' have drastically different views on what transpired during this meeting.

Plaintiff insists that "[a]gain, the [EL] products displayed were unacceptable" and so Nicewicz identified for Defendant required revisions to each pattern necessary for the product to be further considered.  (*Id*. at 12).  Further, according to Plaintiffs, "[t]wo points were made clear" in the meeting:

> First, the samples should be presented as quickly as possible since Labor Day weekend was the target date ASI was contemplating for having inventory in the stores, if it elected an inventory-based system. Second, the revised samples would have to be sent to American Signature for further review, inspection, and approval.

(Doc. 64 at 12 (internal citations omitted)).  Despite these points being "made clear," Plaintiff asserts, "by the end of June 2012, Defendant was still in the process of gathering and sending samples to ASI for its review and consideration."  (*Id*.).

Defendant's view of the meeting varies significantly.  Defendant claims that during the May 16, 2012 meeting, Jay Schottenstein, an ASI executive, "was impressed by EL's TOB

products."  In fact, according to Defendant, "[h]e identified one of EL's products and said, "you should buy that one" loudly enough "for everybody to hear it."  (Doc. 72).  During the walk-through, Defendant claims Nicewicz and Martin selected top-of-bed products in which ASI was interested.  (*Id*.).  "Some were deemed perfect 'as is,' while others required minor modification." Defendant insists "[a]ll of the juvenile products were accepted without modification" and "any modifications to the adult products were merely minor design tweaks."  (*Id*.).  Further, Defendant claims that EL's products "received nothing but positive feedback" from ASI executives Woods, Rabe, Jonathan Schottenstein, and Jay Schottenstein.  (*Id*.).

On the morning of May 16, 2012, ASI's Director of Visual Merchandising, Robert Grimmett, sent an email to Nicewicz, Martin, Rabe, Woods, and three other members of ASI personnel.  In the email, Grimmett stated that "with the price points that I am seeing, would pickup that incremental customer that would pay this price for bedding in our stores."   He also noted that he "could not be more blown away" by the lab store proposals for top-of-bed.  Martin forwarded Grimmitt's email to Brooks that same day with the statement "For your eyes only!"

Nicewicz responded to Grimmett's email the same day explaining the status of negotiations:

> We have not finished negotiating this deal, but will today.  However, it involves a different philosophy than ASI is used to from the past.  This has to be discussed with the management team, but I think if they see the potential, we will be able to resolve issues.

Defendant claims the May 16, 2012 meeting at ASI ended with a summation discussion between ASI and EL representatives led by Nicewicz.  (Doc. 72 Levy Dep. 124-125).  According to Defendant, during this discussion, the parties:  (a) "negotiated prices and quantities and acknowledged the target delivery date"; (b) "EL explained that the 90-day lead time – combined with ASI's target delivery date – meant that EL needed to begin production immediately"; and

(c) "Mr. Nicewicz acknowledged that the circumstances meant that production needed to begin in May 2012."  (Id.).

> 4.    *Communications Between EL and ASI about the Top-of-Bed Products*

Following these meetings, ASI and EL engaged in additional communications, often via email, regarding EL's top-of-bed products.  Plaintiff characterizes these discussions as "communications about the patterns, pricing and shipping in order for ASI to determine the viability of the program."  (Doc. 64).  Defendant, on the other hand, refers to these communications as the parties "finalizing the details" of ASI's order and, later, as ASI "confirming its commitment" to EL.

On May 16, 2012, Martin directed Brooks to email ASI employee Angela Friend "to get a new vendor packet of all info you need from a logistics perspective and compliance."  (Doc. 73 at 68).

On May 17, 2012, Martin emailed Brooks and informed Brooks that "Steve [Nicewicz] needs to put together a financial for Upper Management to get the ball rolling."  (Doc. 73 at 69).  She also requested that Brooks provide "quote sheets."  Brooks forwarded Martin's email to EL's Gelman and Barmucha that same day, indicating that the timeline had been "moved up." (Doc. 73 at 69).

On May 18, Martin forwarded Brooks an email from ASI's Compliance Coordinator Bradley Hoffman discussing details related to EL's law label registration numbers and licensures for vendors and manufacturers.  Brooks, in turn, forwarded the email to EL's Nessim Levy. (Doc. 73 at 70).

On May 21, 2012, Brooks sent "pricing and cube info"  -- the quote sheets Martin had requested – to Martin, with Nicewicz copied.  He noted, "[a]ttached are jpeg's, configuration,

FOB pricing, casepack and cube" for 48 of EL's top-of-bed patterns.  (Doc. 73 at 71-119).  The attached document was entitled "Extreme Linen Quote Sheets 5.21."  Later in the day, Martin asked whether the prices in the quote sheets was accurate in light of the "tweaks" that ASI asked EL to make.  Brooks assured Martin that the prices were accurate even with the requested tweaks.  (Doc. 73 at 55).

On May 22, 2012, Brooks emailed Martin and inquired, "Mesh wants to know where all the orders are ;)."  (Doc. 64-15 at 3).  Martin responded that she was "setting them up now for sign off on Friday [May 25, 2012]."  Brooks answered back, "Hey one thing that could help me is if when you know which beds are def going forward that would be great for us to know." (Doc. 64-15 at 2).  Martin responded by writing, she also informed Brooks that "[w]e are holding on 8 styles for now, everything else is going forward!"  (Doc. 73 at 14).  Brooks then inquired, "Awesome…do you know how many units on each you will buy?"  (Id.).  Martin wrote back "Approx 1,300 units of each pattern (if 2 sizes like QN&KG or TW&FL) Happy Hanukkah." (Id.).  Defendant characterizes this series of emails as Martin conveying ASI's commitment to EL, and the communications that occurred thereafter as ASI "confirm[ing] its commitment." (See e.g. Doc. 72 at 2).  Also on May 22, 2012, Martin and Brooks exchanged emails discussing packaging dimensions, cubes, and casepacks for the top-of-bed goods.  (Def. Exh. 16).

On May 23, 2012, EL provided a completed vendor setup form.  (Def. Exh. 6).  The next day, May 24, 2012, Martin informed Brooks that ASI had assigned EL a "vendor number."  Also on May 24, 2012, Brooks traveled to Columbus to meet with Nicewicz and Martin.  Brooks then emailed Martin and Nicewicz the next day with a "quick recap from yesterday's meeting."  Item number one in the "recap" is "Samples – we are kicking it into high gear to get all what you need."  The email also indicates items discussed at the May 24, 2012 meeting included "props

for beds," sheets for display beds, packaging, price stickers, "shell bed" and "Catherine" beds. (Doc. 73 at 53).

On May 30, 2012, Brooks inquired about how EL could get an ASI vendor manual to review.  (Doc. 73 at 170).  Thereafter, Martin requested that ASI's Global Logistics Manager, Angela Friend, provide Brooks with a "new vendor packet."  (Id. at 171).  Friend informed Martin and Brooks that the new vendor packet "had been sent" and advised, "this usually goes same day as initial orders."  (Id.).  After reading Friend's response, Brooks emailed Martin and inquired, "So does this man the orders were transmitted?"  (Doc. 64-16 at 2).  Martin replied, "no, so I would ask for a copy."  Brooks answered back, "Do you know when they will be?"  (Id. at 1).  Martin advised, "They are not signed off yet. Will let you know."  (Id.).  Brooks then responded to Friend's email: "Orders have not been sent over yet is there any chance to get the manual?"  (Id.).

On June 1, 2012, Brooks contacted Martin and Nicewicz via email regarding "a few things that we still need to get resolution on."  Brooks asked six questions about specific patterns, as well as a question about what brand ASI wanted to use for adult bedding, and what information should be included on price stickers.  Nicewicz answered: "You will get answers on all from me over the weekend."  (Doc. 73 at 50-51).  Brooks responded, "Sounds good…we don't want to ship late."  (Doc. 73 at 173).  Also on June 1, Brooks emailed Nicewicz, with Martin copied, to inform Nicewicz that a "[s]ample of the comforter set bag is headed your way" and informed ASI of the information that would be included on the bags' inserts.  (Id. at 52).

That same day, Brooks emailed other EL personnel and informed them of the status of the relationship with ASI: "Final PO's are still being signed off (and the may be adding another bed or 2!) but I wanted to at least give everyone this so that you can see what the qty's are by

pattern….all except the quilts (they are still working on). There might be some slight adjustments…perhaps more units but this should enable us to get things going e.g. initiate the orders with the factories."  (Doc. 64-22 at 1).

On June 2, in an ASI internal email between Martin and Nicewicz following a meeting Nicewicz had been involved in Martin inquired "Do I dare ask if anything was signed off?" Nicewicz responded, "TOB- giving him all details and $ on Monday – will get Jon and Cornell to sign off."  (Doc. 73 at 16).

According to Defendant, on or about June 4, 2012, EL owner Yigal Barmucha met with Nicewicz at ASI's Columbus offices.  Barmucha claims that when he asked Nicewicz about purchase orders, Nicewicz "assured him they were coming," "everything was going according to plan," and "there was nothing to worry about."  (Doc. 64 citing Barmucha Dep. 249-253, Levy Dep. 136-137).  In fact, Barmucha claims Nicewicz indicated that all that was required was for Martin, who was on vacation, to "key in the purchase orders."  The two also discussed production and Barmucha claims Nicewicz emphasized the need to "go, go, go" to meet the ASI shipment date.  (Barmucha Dep. 252).  Thereafter, over the course of the next four days, EL finalized and issued its own orders for the production of the top-of-bed goods in China.  (Pl. Exh. 25).

On June 5, 2012, Brooks and EL employee Cathy Chan internally discussed the production lead time for the "American Signature furniture program."  Chan informed Brooks that the dates when the goods would be ready in China "depends on when we can get customer's PO."  (Doc. 64-23).  Brooks responded, "I am still waiting on their hard orders, but I thought we were placing with the factories based on the qtys' that I sent out last week...these are what they are ordering.  Every day that passes is another day when the goods won't be ready.  This all is

time sensitive…we need to place." (Id.). Later in the conversation Brooks again communicated to Chan that "We need to start placing ASAP, this order is too important." (Doc. 64-25 at 1). That same day, Baramucha approved the factories moving forward with production of the top-of-bed goods. Between June 6, 2012 and June 8, 2012, Defendant began submitting written purchase orders with factories. (Doc. 64-25; Doc. 64 at 15).

On June 8, 2012, Brooks emailed Nicewicz, with Martin copied, to discuss a sample ASI would be getting for the Beverly Hills Polo Club pattern. Brooks informed ASI that the sample bag would be "missing a few things," so he would be sending a "rendition of the bag" via email. Brooks concludes by stating, "Once you receive we I (sic) need you to confirm that we can move forward. I also need to know about the bag I sent you last week." (Doc. 73 at 47). On June 11, 2012, Brooks fulfilled his promise to send Nicewicz a "rendering" of the Beverly Hills Polo Club bag. Nicewicz responded that same day and stated, "1. The bag sent last week is great. 2. BHPC – I like the second one." (Doc. 73 at 48).

On June 15, 2012, Brooks emailed Nicewicz and Martin to give them "an update on the samples." He stated that, "By Monday I should have approx. 20 sets ready to send back to you." The email also contained information on "delivery dates." Brooks noted, "I have confirmed ex-China dates on everything but 2 of the beds….I should have by next week. We know that 8/1 ex-China is the target date but is not achievable with all of the beds, we will continue to push on our side to get dates improved if we can." (Doc. 73 at 43). The email also included a 'Delivery Dates' chart, listing the name of each pattern and the corresponding "confirmed ex-China" delivery date, spanning from August 1, 2012 to September 5, 2012. (Id. at 46). Three days later, Brooks again emailed Nicewicz and Martin in this same email chain with an updated 'Delivery

Dates' chart.  Brooks then requested that the ASI representatives "advise on the status of all the PO's."  (*Id*. at 43).

On June 13, 2012, Brooks provided Nicewicz and Martin with an update on the top-of-bed product samples.  Brooks notified the ASI representatives that "we have 75% of what is needed."  (Doc. 64-28 at 1).  On June 18, 2012, Brooks again emailed Martin and asked "Any update on when we will get all the orders?"  (Doc. 64-17 at 1).  Martin answered, "need to check with Steve. Will let you know."  *(Id.)*.

Also on June 18, 2012, EL's Chief Operating Officer, Nessim Levy, and Bradley Hoffman, ASI's Compliance Coordinator, along with several other EL and ASI representatives, corresponded via email.  The thrust of the conversation was a discussion of labeling and packaging questions.  Specifically, Hoffman confirmed the proper language that should be used on any "law labels."  The parties also discussed the manufacturers registration numbers and licensures.  (Doc. 73 at 41).

On June 21, 2012 Brooks emailed Nicewicz and Martin.  The subject line read, "Extreme Linen- pre production samples headed your way."  In the email, Brooks stated, "Have samples headed back out today….19 sets. Please note these are pre-production samples but wanted to get these back to you as we have made the changes you asked for on shams/euros/dec pillows etc…" (Doc. 73 at 38).  Brooks also asked "which option to proceed with" on the "Euro's" for the "Emily" pattern.  In her response, Martin said, "I think the all black euro's are the best option but ultimately Steve makes the decision.  Steve, let the group know what you think."  (*Id*.).  Brooks responded, "And the PO's….everyone here is clamoring to get them!!!! A case of Chopin is on the line!"  (Doc. 64-19 at 1).

Later in the day, Brooks wrote back that 16 boxes were headed to ASI.  Martin answered

back, "Can't wait to get these on the beds."  (Doc. 73 at 37).  Brooks responded, "the changes

that were made look good…now you will be able to see basically what the beds will look

like…more will be sent out next week once we get the missing pieces."  (Doc. 73 at 36).  He also

stated, "Jen – remember I need from you the info on the price stickers and the info on the

inserts."  (*Id*. at 36).  The next day, in the same email chain, Martin responded, "Inserts are not

complete.  Will advise.  I will be sending you a packet of the price stickers."  (*Id*.).

On June 22, 2012, Brooks emailed Martin requesting her assistance in getting feedback

from ASI's "planning department."  Martin responded, "Todd will be your planner."  An

individual named Todd Lilly was copied on the email.  Brooks then forwarded that email to

Daria Jones of Extreme Linen, informing her that "Todd will be the planner so he should be

getting back to you with the info you need."  (Doc. 73 at 24).  Later that same day, ASI's Global

Logistics Manager Angela Haddox emailed Daria Jones of Extreme Linen and informed that

"Once orders are actually placed we will be able to advise who the planner is."  (Doc. 73 at 25).

EL's Brooks and Nessim Levy were also included on this email.

On June 25, 2012, Brooks and Martin again corresponded via email.  In response to

Brooks's request that Martin "Get on your boss for me on…the orders," Martin responded,

"Waiting for Jonathon to sign off."  (Doc. 73 at 22).  Also on June 25, 2012, EL's Daria Jones

emailed ASI's Bradley Hoffman a list of manufacturer registration numbers.  (Doc. 73 at 40).

### 5.     *Samples*

Plaintiff claims that "final samples" were never provided to ASI.  Specifically, Plaintiff

asserts that, "[a]t the time Mr. Nicewicz identified the revisions he needed to see to each of the

patterns proposed by Defendant, ASI made clear that final, top-of-production, samples needed to

be signed off on and presented to the Executive Committee during the formal sign-off process."
(Doc. 64 citing Pla. Exh. 3).  Plaintiff claims Defendant failed to deliver timely.  On May 25,
2012, the Friday that Martin had hoped to submit the sign-off request to the Executive
Committee, Brooks informed Martin via email: "Samples—we are kicking it into high gear to
get all what you need."  (*Id*.).  On June 13, 2012, however, Defendant informed Plaintiff that the
samples were still incomplete: "[a] good portion of the pieces that we needed on the samples
have arrived, I would say we have 75% of what is needed."  (*Id*.).

Two days later, Plaintiff claims Brooks again delayed the production of samples, stating
that it would be the following Monday, June 18, 2012, before he could send out approximately
20 of the sets, but that Defendant's promised delivery turned out to be untrue.  (*Id*. citing Pla.
Exh. 28.).  On June 21, 2012, Brooks sent Nicewicz and Martin an email with the subject-line
"Extreme Linen-preproduction samples headed out your way."  That email explained that 19 sets
of samples would be headed to ASI but "[p]lease note, these are pre-production samples but
wanted to get these back to you as we have made the changes you asked for on shams/euros/dec
pillows etc."  (*Id*. citing Pla. Exh. 29).  Plaintiff insists that "as of June 25, 2012, a number of
revised samples still had not been presented to ASI for its review."  (*Id*. at 16 citing Pl. Exh. 29).

### 6.    *Mr. Nicewicz's Termination*

At some point in late June, Nicewicz's employment at ASI came to an end.  On June 26,
2012, prior to his departure, Nicewicz emailed Rabe, Woods, and Jonathan Schottenstein,
informing them of "the major issues that need to be addressed," the first of which was "Top of
bed – extreme linen and Well Dressed Bed."  (Doc. 73 at 15).  On June 27, 2012, Nicewicz
emailed to inform Brooks that he was no longer with ASI.  Nicewicz's email concluded,
"Jennifer [Martin] will finish this up." (Doc. 72 citing Def. Exh. 6; Doc. 73 at 21).  Brooks

forwarded Nicewicz's email to EL executives Barmucha and Mesh Gelman that day and noted to

them that "Jen understands the need to get the orders to us."  (Doc. 73 at 21).  Martin and Brooks

spoke directly on this same day and Brooks claimed he asked Martin what to expect as a result of

Nicewicz's termination.  According to Brooks, "Martin responded that she would meet with Mr.

Woods and get the purchase orders finalized."  (Doc. 72).

### 7. *ASI Informs EL it Will Not Place Purchase Orders*

Despite Defendant's claim that Plaintiff had informed EL that ASI already had made the

decision to go to a cash-and-carry model for top-of-bed products during the May 16, 2012

meeting between the parties at ASI's Columbus headquarters, (Doc. 72), Plaintiff claims that on

June 27, 2012, ASI decided not to change from the drop-ship program.  (Doc. 64 at 16).

According to Plaintiff, as of that date, ASI's Executive Committee "had never considered (let

alone approved) the purchase of the Disputed Goods."  (*Id*.).  In fact, Plaintiff claims, at that time

ASI was still waiting for samples and its internal buyers were still waiting for final price quotes

in order to create a presentation for the Executive Committee.  (*Id*. at 16-17).

On June 28, 2012, Plaintiff claims that Martin notified Brooks "that ASI would not be

moving forward with an inventory-based program and thus would not be working with the

Defendant."  (Doc. 64 at 17).  Martin has noted that, during that phone call, Brooks did not

indicate that he believed ASI had ordered the goods.  (*Id*.).  On or about June 29, 2012,

Defendant informed ASI that it had already started manufacturing the goods.  (*Id*.).  Plaintiff

claims this was the first time Defendant notified ASI that the goods were already in production.

(*Id*.).

From Defendant's perspective, Martin called Brooks on June 28, 2012, asked if he was

sitting down, and "told him that ASI was not taking the TOB products."  Brooks claims that he

explained to Martin "that this could cost him his job and potentially put EL out of business." (Doc. 72).  Defendant claims Martin then said she would speak with Woods and Rabe "to explain to them that ASI was obligated to take the goods."  (*Id.*).  That same day, Martin emailed ASI employee Beth Hopkins requesting a meeting with Rabe.  Martin stated, "I need to speak to Steve concerning Extreme Linen TOB.  They are already in production on TOB that I don't believe we can get out of."  (Doc. 73 at 19).

Thereafter, ASI and EL representatives had two conference calls, on June 29, 2012 and July 2, 2012 respectively, discussing the disputed top-of-bed products.  Gelman, Barmucha, Levy, and Brooks participated for EL.  Jonathan Schottenstein, Woods, Rabe, Martin, and Tod Friedman, ASI's in-house counsel, participated for ASI.  (Doc. 72).  Defendant apparently expressed its belief that Plaintiff had purchased, and thus was obligated to pay for, the disputed top-of-bed products.  According to Defendant, ASI explained that no commitment had been made because purchase orders had not been issued.  Following the second phone conference, EL notified the Chinese factories to cease production on ASI's TOB products.  This litigation followed.

## B.    Procedural Background

Plaintiff brought this action on July 6, 2012 seeking a declaration from the Court that no agreement, oral or otherwise, exists between ASI and EL and that ASI has no liability to Defendant.  (*Compl.*, Doc. 1).  In response, Defendant asserted two counterclaims: (1) breach of contract (Count I); and (2) promissory estoppel (Count II).  (*Answer and Counterclaims*, Doc. 9).

In its breach of contract claim, Defendant alleges that the communications and conduct that took place between ASI and EL "constituted established and recognized the existence of ASI's agreement to purchase the Subject Merchandise at the prices and specifications set forth in

the Quote Sheet."  Additionally, Defendant alleges that EL performed all of its obligations under the agreement and has been damaged in an amount exceeding $75,000 as a direct and proximate cause of ASI's acts and omissions.

In its promissory estoppel claim, as an alternative to breach of contract, Defendant alleges that "ASI should reasonably have expected its communications and conduct to induce EL to commence manufacturing the Subject Merchandise."  Further, EL "relied on such communications and conduct in commencing the manufacture of the Subject Merchandise" and its reliance was reasonable under the circumstances.

Plaintiff now moves for summary judgment on both of Defendant's counterclaims.  (Doc. 64).  This matter has been fully briefed and is ripe for review.

## III.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides, in relevant part, that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56.  A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, (1986)).  The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 339-40 (6th Cir.1993).  The suggestion of a mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment.  *See Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir.1992).  Summary judgment is inappropriate, however, "if the dispute is about a material fact that is 'genuine,' that is, if the

17

evidence is such that a reasonable jury could return a verdict for the non-moving party."
*Anderson*, 477 U.S. at 248.

The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson,* 477 U.S. at 251-52).  In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party.  *United States S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir.2013).  The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party.  *See Anderson,* 477 U.S. at 251; *Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir.1995).

## IV.        ANALYSIS

### A.        Threshold Matters

It is well-settled that a party may not attempt to create a genuine issue of material fact for summary judgment purposes with evidence that would be inadmissible at trial.  *See Weber v. Franks,* 229 F.3d 514, 526 n. 13 (6th Cir. 2000) (disregarding allegations based on hearsay rather than personal knowledge); *Sperle v. Mich. Dept. of Corrections,* 297 F.3d 483, 495 (6th Cir. 2002); *Weldon v. Warren Cnty. Children Servs.*, No. 1:12-CV-279-HJW, 2013 WL 6256476, at *3 (S.D. Ohio Dec. 4, 2013).  With this principle in mind, the Court will first address two threshold evidentiary challenges Plaintiff has made to evidence put forth by Defendant in Defendant's briefing.

*1. Recordings*

Defendant's Memorandum in Opposition refers to excerpts of surreptitious recordings, and cites unofficial transcripts of those recordings, that EL representatives Yigal Barmucha and Cathy Chan made of conversations with Martin when employees from both parties traveled to China to conduct discovery in the Chinese factories commissioned by EL to make the disputed top-of-bed products. Plaintiff argues that these recordings are inadmissible and may not be considered by the Court on summary judgment. (*Pl. Reply*, Doc. 80 at 8). This Court agrees.

Evidence "submitted in opposition to a motion for summary judgment must be admissible." *U.S. Structures, Inc. v. J.P. Structures, Inc.,* 130 F.3d 1185, 1189 (6th Cir. 1997); *see also Wiley v. United States,* 20 F.3d 222, 226 (6th Cir.1994) (quoting *Beyene v. Coleman Sec. Servs., Inc.,* 854 F.2d 1179, 1181 (9th Cir.1988)) ("[I]t is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment."). In order for a sound recording to be admissible, it must be properly authenticated. *United States v. Adams*, 722 F.3d 788 (6th Cir. 2013) ("The admission at trial of tape recordings rests within the sound discretion of the trial court, and that discretion presumes, as a prerequisite to admission, that the tapes are authentic, accurate, and trustworthy.").

Evidence is authenticated when the record establishes that it "is what its proponent claims." *Boddie v. Warden, Chillicothe Corr. Inst.*, 2015 U.S. Dist. LEXIS 22697, 16 (S.D. Ohio Feb. 25, 2015) (*quoting* Fed.R.Evid. 901(A)). A sound recording may be authenticated through a combination of methods, including voice identification, content, and other surrounding circumstances. Fed.R.Evid. 901, 28.

The burden is on the opposing party to object to evidence that is inadmissible. *McQuain v. Ebner Furnaces*, Inc., 55 F. Supp. 2d 763, 770 (N.D. Ohio 1999). Here, Plaintiff has met that

burden.  Plaintiff argues that these recordings are inadmissible and may not be considered by the Court on summary judgment because they were made in violation of the Rules of Civil Procedure and the Ohio Rules of Professional Conduct.  (Doc. 80 at 8).  "The failure to authenticate a document properly precludes its consideration on a motion for summary judgment."  *Steele v. Jennings*, No. 2:04-CV-189, 2005 WL 2124152, at *3-4 (S.D. Ohio 2005) (quoting *Robinson v. Bodoff,* 355 F.Supp.2d 578, 582 (D.Mass.2005) (striking all exhibits that were submitted without affidavits and were not self-authenticating).  *See also Soliday v. Miami County, Ohio,* No. C–3–91–153, 1993 WL 1377511, at *5 n. 4 (S.D. Ohio Nov. 22, 1993) (stating that "the Court cannot consider" deposition testimony referenced in summary judgment reply memorandum but not filed with court).  Unauthenticated evidence is not proper evidence for opposing a motion for summary judgment; thus, this Court cannot consider it.

In this case, Defendant has not produced the audio recording, and it has not been authenticated.  While Defendant indicates in its Memorandum in Opposition that it planned to seek this Court's leave to file the disc containing the recordings, no such leave has been sought and this Court is unaware of any recordings that have been properly filed with the Court.  Therefore, the recordings and unofficial transcripts of the recordings fail to qualify as proper summary judgment evidence under Rule 56.  *See* Fed.R.Civ.P. 56.

Further, the use of transcripts is a matter commended to the trial court's discretion.  *United States v. Onori,* 535 F.2d 938, 947 (6th Cir. 1976); *United States v. McMillan,* 508 F.2d 101, 105 (8th Cir. 1974), *cert. denied,* 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1974).  The preferred practice in the Sixth Circuit is for parties to stipulate to their accuracy.  *Vinson,* 606 F.2d at 155.  *See also United States v. Crane,* 632 F.2d 663, 664 (6th Cir. 1980) *(per curiam); United States v. Smith,* 537 F.2d 862, 863 (6th Cir. 1976) *(per curiam).*  In the absence of such a

stipulation, "the transcriber should verify that he or she has listened to the tape and accurately transcribed its content.  The court should also make an independent determination of accuracy by reading the transcript against the tape."  *United States v. Robinson*, 707 F.2d 872, 878-79 (6th Cir. 1983).  Because the unofficial transcript has not been stipulated to by the parties and the actual recordings are not before the Court for the Court to make an independent determination of accuracy, the unofficial transcript submitted by Defendant is also inadmissible at this time.  The Court, therefore, declines to consider the recordings on summary judgment.

## 2.      Expert Testimony

Plaintiff also challenges Defendant's use of Jacqueline Hamm's expert report in its Memorandum in Opposition, arguing that Hamm's opinion on the issue of whether the parties objectively manifested their intent to form a binding agreement is improper.  Again, this Court agrees.

Not all types of evidence are permissible in an opposition to a motion for summary judgment.  *Steele v. Jennings*, No. 2:04–CV–189, 2005 WL 2124152, at *3 (S.D.Ohio, Aug.31, 2005).  As the Sixth Circuit has held "only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment."  *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir.1994); *see also Foos v. City of Delaware*, No. 2:08-CV-0873, 2010 WL 3489384, at *4 (S.D. Ohio Aug. 31, 2010) *aff'd*, 492 F. App'x 582 (6th Cir. 2012).  Under the Federal Rules of Evidence, Rule 704(a) "does not lower the bar so as to admit all opinions —an evidentiary problem remains 'if testimony containing a legal conclusion is allowed, as it may convey a witness's unexpressed, and perhaps erroneous, legal standards to the jury.'"  *In re Welding Fume Products*, No. 1:03-CV-17000, 2005 WL 1868046, at *7 (N.D. Ohio Aug. 8, 2005) (*quoting United States v. Smith*, 2003 WL 21675340 at *5 (6th Cir. July 15, 2003), cert. denied, 540 U.S.

976, 124 S.Ct. 457, 157 L.Ed.2d 328 (2003)).  Further, expert testimony that "constitutes mere personal belief as to the weight of the evidence invades the province of the jury."  *In re Welding Fume Products*, 2005 WL 1868046 at *7 (*quoting Indiana Ins. Co. v. General Elec. Co.*, 326 F.Supp.2d 844, 847 (N.D. Ohio 2004)); *see also McGowan v. Cooper Indus., Inc.*, 863 F.2d 1266, 1273 (6th Cir. 1987).

Because Hamm's opinion regarding whether the parties assented to be bound is a legal conclusion, the evidence is inadmissible and will not be considered for purposes of determining whether summary judgment should be granted.  *See, e.g.*, *Wiley*, 20 F.3d at 226.

## B.    Breach of Contract

This action was removed from Ohio state court under this Court's diversity jurisdiction, and therefore, this Court applies Ohio substantive law to Counts I and II.  *See Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).  *See also Jandro v. Ohio Edison Co.,* 167 F.3d 309, 313 (6th Cir. 1999);  *Orchard Grp., Inc. v. Konica Med. Corp.*, 135 F.3d 421, 425 (6th Cir. 1998) ("When deciding a diversity case, a federal court must apply the substantive law of the state's highest court.");  *Energy Mktg. Servs., Inc. v. Homer Laughlin China Co.*, 186 F.R.D. 369, 373-74 (S.D. Ohio 1999) *aff'd*, 229 F.3d 1151 (6th Cir. 2000).

In Count I of Defendant's Answer and Counterclaims, Defendant alleges that Plaintiff is liable for breach of contract.  To prove a breach of contract claim, a party must demonstrate the existence of a contract, performance, breach, and damage or loss.  *Nilavar v. Osborn*, 137 Ohio App. 3d 469, 738 N.E.2d 1271, 1281-82 (Ohio App. 2000) (*quoting Doner v. Snapp*, 98 Ohio App.3d 597, 600 (Ohio App. 1994)).  A contract is generally defined as "a promise, or a set of promises, actionable upon breach."  *Coffman v. Ohio State Adult Parole Auth.*, No. 12AP–267, 2013 WL 209133, at *2 (Ohio App. 2013).  To prove the existence of a contract, the party

22

alleging a breach must first demonstrate the essential elements of contract formation: offer, acceptance, contractual capacity, consideration, manifestation of mutual assent, and legality of object and of consideration.  *See, e.g.*, *id*.; *Kostelnik v. Helper,* 96 Ohio St.3d 1, 770 N.E.2d 58, 61 (Ohio 2002).  To prove that a contract exists, a plaintiff must show "that both parties consented to the terms of the contract, that there was a 'meeting of the minds' of both parties, and that the terms of the contract are definite and certain."  *Nilavar*, 137 Ohio App. 3d at 483-84 (quoting *McSweeney v. Jackson*, 117 Ohio App.3d 623, 691 N.E.2d 303, 308 (Ohio Ct.App. 1996)).

Mutual assent to the terms of a contract generally is manifested by an offer and acceptance.  "Manifestation of mutual assent to an exchange requires that each party either make a promise or begin or render a performance."  *Nilavar*, 137 Ohio App. 3d 469, 483-84 (internal citations omitted); *see also* Restatement 2d, Contracts, § 18 (1981).  Further, manifestation of mutual assent may be made "wholly or partly by written or spoken words or by other acts or by the failure to act."  *Nilavar*, 137 Ohio App. 3d 469, 483-84; *see also Terex Corp. v. Grim Welding Co.*, 58 Ohio App.3d 80, 568 N.E.2d 739, 741 (Ohio Ct. App. 1989) (the term "contract" includes every description of agreement or obligation, *whether verbal or written,* whereby one party becomes bound to another to pay a sum of money or to perform or omit to do a certain act).

Plaintiff sets forth four independent grounds for which Defendant's breach of contract claim fails as a matter of law.  First, Plaintiff maintains that no ASI agent with whom EL agents communicated had actual or apparent authority to bind contractually SI.  Second, Plaintiff argues that ASI neither made nor accepted an offer to contract.  Third, Plaintiff asserts that Defendant never made a contractual offer.  Fourth, Plaintiff insists that any purported contract fails for lack

of definiteness because any alleged agreement did not include all of the essential terms as required under Ohio law.

Defendant counters that genuine issues of material fact abound on its breach of contract claim, and thus summary judgment for Plaintiff is inappropriate. Specifically, Defendant argues that there are factual disputes with regard to: (1) whether Martin had actual authority as an agent to bind ASI as the principal; (2) whether Nicewicz and Martin had apparent authority to bind ASI; (3) whether the elements of contract formation were met and, specifically, whether there was a manifestation of mutual assent; and (4) whether the alleged agreement was definite as to the essential terms.

Despite the varying characterizations of the communications and conduct that took place here, the parties do not appear to dispute the material facts in this case. Instead, the parties dispute whether the facts – specifically, the communications between the parties – gave rise to a legal contract. In such a circumstance, "whether a contract exists is a mixed question of law and fact." *Storm v. Bureau of Prisons*, No. 4:08CV1690, 2009 WL 1163123, at *6 (N.D. Ohio Apr. 29, 2009) (citing Cienega Gardens v. United States, 194 F.3d 1231, 1239 (Fed.Cir.1998); see also *Frazier v. Navistar Int'l Transp. Corp.*, No. 99-CA-89, 2000 WL 426162, at *3 (Ohio Ct. App. Apr. 21, 2000) (internal citations omitted). Courts have held that summary judgment may be granted where the material facts involved in the matter are undisputed and questions of law predominate. *Univ. of Tennessee William F. Bowld Hosp. v. Wal-Mart Stores*, Inc., 951 F. Supp. 724, 725-26 (W.D. Tenn. 1996) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).

*1.     Offer*

An offer is a manifestation of willingness to enter into a bargain.  *Studebaker v. Staudter*, No. 15508, 1996 WL 491795, at *2-3 (Ohio Ct. App. Aug. 30, 1996).  The manifestation must be clear enough "to justify another person in understanding that his assent to that bargain is invited and will conclude it."  *Wee Care Child Ctr., Inc. v. Ohio Dep't of Job & Family Servs.*, 2014-Ohio-2913, ¶¶ 36-39 (affirming summary judgment on plaintiff's breach of contract claim because a letter notifying Wee Care that (1) its license expired at the end of the year and (2) it was required to submit a renewal application form and fee payment to renew its license, was not an offer where it contained no willingness to bargain but, rather, was informational in nature). Further, an offer must be definite as to its terms.  *Studebaker*, 1996 WL 491795 at *2-3.  A valid and binding contract comes into existence when an offer is accepted.  *Dyno Const. Co. v. McWane, Inc.*, 198 F.3d 567, 572 (6th Cir. 1999).  The manifestation of assent by the offeree constitutes the acceptance.  *Ford*, 86 Ohio App. 3d 364, 380-81; *see also El-Seblani v. IndyMac Mortgage Servs.*, 510 F. App'x 425, 430 (6th Cir. 2013) ("Unless acceptance is unambiguous and in strict conformance with the offer, no contract is formed.") (internal citations omitted).

Ohio Revised Code § 1302.07(A), the state's codification of UCC § 2–204, provides that "a contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."  *See* Ohio Rev. Code § 1302.07(A); *see also Energy Mktg. Servs., Inc.*, 186 F.R.D. 369, 374 (S.D. Ohio 1999) *aff'd*, 229 F.3d 1151 (6th Cir. 2000);  *Tlg Electronics, Inc. v. Newcome Corp.*, No. 01AP–821, 2002 WL 338203, at *2 (Ohio Ct.App. Mar. 5, 2002).

Courts and commentators generally agree that the UCC takes a liberal view of what is required to create a contract for the sale of goods.  *See, e.g., Am. Bronze Corp. v. Streamway*

*Prods.*, 8 Ohio App.3d 223, 456 N.E.2d 1295, 1299 (Ohio App. 1982) (recognizing that §

1302.07 liberally defines the formation of sales contracts); *Architectural Metal Sys., Inc. v.*

*Consol. Sys., Inc.*, 58 F.3d 1227, 1230 (7th Cir.1995) (recognizing that the UCC tolerates "a

good deal of incompleteness and even contradiction in offer and acceptance"); White and

Summers, Uniform Commercial Code § 1-2 at 4-5 (4th Ed.1995) (noting that Article 2 of the

UCC makes contracts easier to form by reducing the required formalities).  Neither the UCC nor

the Ohio Revised Code, however, eliminate the requirement that, for a contract to be enforceable,

it "must ...be specific as to its essential terms, such as the identity of the parties to be bound, the

subject matter of the contract, consideration, a quantity term, and a price term." *E.C. Styberg*

*Engineering Co. v. Eaton Corp.*, 492 F.3d 912, 917 (7th Cir. 2007) (interpreting Ohio law)

(citing *Alligood v. Procter & Gamble Co.*, 72 Ohio App.3d 309, 594 N.E.2d 668, 669 (1991)).

Moreover, "it is most often the buyer's purchase order, submitted in response to such a quotation

that constitutes the offer." *Babcock & Wilcox Co. v. Hitachi Am., Ltd.*, 406 F.Supp.2d 819, 827

(N.D. Ohio 2005); *see also Tlg Electronics, Inc.*, 2002 WL 338203 at *3("Generally, the

submission of a purchase order may be deemed an offer to be accepted or rejected by the

seller."); *Dyno Const. Co.*, 198 F.3d at 572 (a buyer's purchase agreement is deemed an offer).

     For example, in *Babcock & Wilcox Co.*, the court held that a price quotation between

subcontractor and contractor did not constitute valid contractual offer under Ohio law.  Instead,

the totality of circumstances indicated that the parties' intention was to continue engaging in

negotiations to reach a mutually acceptable agreement.  *Id*.  A subsequent purchase order was an

offer – it contained explicit instructions regarding the method of acceptance.  The contractor

accepted the offer by shipping the goods, as contemplated in the purchase order.  *Id*.

a.     Whether ASI Made an Offer to EL

This Court finds that ASI never made an offer to EL.  Defendant argues that the communications and conduct by ASI representatives throughout May 2012 and June 2012 establish the existence of a contract, or at least create genuine issues of material fact as to whether a contract was formed between the parties.  Defendant supports the assertion that ASI made an offer by pointing to the parties' exchange of price quotes, pattern adjustments, and other product details, in conjunction with Martin's May 22, 2012 email in which she informed Brooks that ASI was "going forward" on all but eight top-of-bed patterns and concluded with "Happy Hanukkah."

Plaintiff argues that the parties merely engaged in ongoing discussions, information exchanges related to "basic product development," and negotiations about the design and quality of the proposed goods – none of which constitutes an offer or acceptance.  (Doc. 64 at 23-25). According to Plaintiff, the quantities the parties discussed were a forecast – no definitive quantity was ever provided; the port and target delivery dates, which were discussed here, were determined on a pre-contract basis as part of the product development process; Defendant was provided with various information and approvals from Plaintiff (such as the provision of a vendor manual, and approval of packaging labels) only at Defendant's request and with Defendant's knowledge that purchase orders had not been submitted; and, finally, the statement "Happy Hanukkah" was "little more than Ms. Martin's congratulations to Brooks that the products he was pitching made it to the sign-off process."  (Doc. 80 at 19-20).  Moreover, Plaintiff insists that the undisputed fact that Defendant never received purchase orders for any of the top-of-bed products that ASI allegedly ordered is dispositive.

This Court finds that, because (1) it is undisputed that no purchase orders were ever issued; (2) EL was told on at least seven occasions (emails on May 22, 2012, May 30, 2012, June 18, 2012, June 21, 2012, June 22, 2012, and June 25, 2012, as well as in a conversation between Barmucha and Nicewicz on June 4, 2012) that ASI was waiting for "sign-off" to complete the purchase orders; and (3) any alleged offer was not specific as to its essential terms, including the specific items ASI agreed to purchase, ASI never made an offer for a contract to EL.  In addition, any alleged agreement could not have been specific as to the items for purchase when EL was still sending samples to ASI incorporating the changes it had been asked to make as late as June 20, 2012.  The totality of the circumstances of this case indicate ASI's intention was to continue engaging in negotiations and product development discussions until such time as the final purchase orders were approved by ASI's Executive Committee and submitted to EL to accept. *See Babcock & Wilcox Co.*, 406 F.Supp.2d at 827; *E.C. Styberg Engineering Co.*, 492 F.3d at 918 (upholding the district court's conclusion that communications between the parties were "ongoing negotiations about a contract that never came to fruition rather than an actual contract.").

Further, the Court finds the conduct and communications between the parties insufficient to establish a contract based on conduct.  Generally, a contract based on conduct is found "either where there was repeated and ongoing conduct manifesting an agreement or where the parties had an established course of dealing to which they adhered." *E.C. Styberg Engineering Co.* 492 F.3d at 919; *see also Central Transp., Inc. v. Cleveland Metallurgical Supply Co.*, No. 63055, 1993 WL 266924, at *2–3 (Ohio Ct. App. July 15, 1993) (finding that the parties' conduct manifested an agreement where the buyer submitted a purchase order, the seller had shipped coal to the buyer on numerous prior occasions, the buyer paid for each

28

shipment, and the parties continued to do business in this manner even after a dispute arose); *Am. Bronze*, 456 N.E.2d at 1300 (holding that a binding contract was formed when the parties followed their usual procedures for placing and accepting orders).  In this case, the parties had never previously transacted any business; thus there was no established course of dealing to which they were adhering.

Moreover, while the parties engaged in ongoing communications discussing various logistical details of a top-of-bed product order, ASI representatives also continually emphasized that the placement of an order was contingent on the submission of purchase orders.  Such statements unambiguously communicated that Plaintiff did not intend to conclude a bargain until the purchase orders were submitted to Defendant.  Therefore it would be unreasonable for EL to assume that a binding agreement had been made.  *See Frazier v. Navistar Int'l Transp. Corp.*, No. 99-CA-89, 2000 WL 426162, at *4 (Ohio Ct. App. Apr. 21, 2000) (holding that there was no valid offer based on the combination of letters and a written application about entry into a retirement program when the letter and the application unambiguously indicated that the company reserved the right to limit the number of participants in the program, that applicants were not guaranteed participation, and that those who were permitted to participate would be notified by the company in the program; based on these factors, "Appellants had reason to know that the bargain would not be complete until Navistar accepted the application….a reasonable person could only conclude that Navistar did not intend to complete the bargain until they manifested the further intent to accept the individual into the program.").

b.     Whether EL Made an Offer to ASI

This Court also finds that EL did not make an offer to ASI.  Under Ohio law, a price quotation is considered an invitation for an offer, rather than an offer to form a binding contract.

*L.B. Trucking Co. Inc. v. C.J. Mahan Constr. Co.*, No. 01 AP–1240, 2002 WL 1969645, at *4

(Ohio Ct. App. Aug. 27, 2002); *see also Dyno Constr. Co.*, 198 F.3d at 572 (applying Ohio law);

*E.C. Styberg Engineering Co.*, 492 F.3d at 918 (applying Ohio law to uphold the trial court's

finding after a bench trial that no contract existed between the parties).   To constitute an offer,

price quotations must be made under circumstances evidencing the offeror's express or implied

intent that its acceptance shall constitute binding contract.  *See Dyno Const. Co.*, 198 F.3d at

574.  For example, in *Dyno Const. Co.*, the Sixth Circuit, applying Ohio law, found that the price

quotations at issue were not offers.  The word "estimate" printed at the top of the first quote

sheet, and the message "please call" printed on the cover sheet of the second quote sheet,

indicated an invitation to engage in future negotiations rather than an offer to enter into a

contract.  *Id*.  Further, while each price quotation included descriptions of materials, prices, and

quantities, neither identified a place of delivery, time of performance, or terms of payment.  *Id*.

Therefore, the price quotations did not constitute offers.  *Id*.

 Plaintiff argues that, here, EL did not make an offer.  The price list ASI was provided

quotes the "FOB cost" of the standard line and "Master Carton instructions" for how the

products are typically shipped, but does not include lead time for production, delivery port, or

delivery date.  Further, Plaintiff notes that ASI was never given a revised price list for the

"revised goods" following Nicewicz's proposed revisions.  (Doc. 64 at 29).

 Even when viewing the facts in the light most favorable to the non-moving party, the

undisputed facts demonstrate that EL's price quotation documents lacked evidence of

Defendant's express or implied intent that ASI's acceptance of the quotes would constitute a

binding contract.  Specifically, the price quotations did not include the stated a place of delivery,

time of performance, or terms of payment.  *See, e.g.*, *Dyno Const. Co.*, 198 F.3d at 574. Therefore, this Court finds that EL did not make an offer to ASI.

Because the Court has determined that an offer was never made by either party, the Court need not address Plaintiff's remaining arguments related to contract formation.[1]  The Court next will address whether Defendant has presented a claim for promissory estoppel sufficient to withstand summary judgment.

### C.      Promissory Estoppel

In Count II of Defendant's Answer and Counterclaims, Defendant alleges, in the alternative, that Plaintiff is liable under a theory of promissory estoppel.

In Ohio, "[p]romissory estoppel is a quasi-contractual concept where a court in equity seeks to prevent injustice by effectively creating a contract where none existed." *Telxon Corp. v. Smart Media of Del., Inc.*, 2005 WL 2292800, at *21 (Ohio Ct.App. Sept. 21, 2005).  "'A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'"  *McCroskey v. State*, 8 Ohio St.3d 29, 456 N.E.2d 1204, 1205 (Ohio 1983) (adopting Restatement 2d, Contracts, § 90 (1973)); *see also Shampton v. Springboro*, 98 Ohio St.3d 457, 786 N.E.2d 883, 887 (2003); *Niemi v. NHK Spring Co., Ltd.*, 543 F.3d 294, 303–04 (6th Cir. 2008); *Commerce Benefits Grp., Inc. v. McKesson Corp.*, 326 F. App'x 369, 374-75 (6th Cir. 2009).

Under Ohio law,  "the elements necessary to establish a claim for promissory estoppel are: (1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the

---

[1] Even if an offer was made, Defendant's breach of contract claim would still fail because it cannot prove acceptance, mutual assent, or that there was a "meeting of the minds," elements that are essential to proving the existence of a contract under Ohio law.  *See, e.g., Nilavar v. Osborn*, 127 Ohio App. 3d 1, 11, 711 N.E.2d 726, 732 (1998), modified on reconsideration (May 12, 1998).

promise is made; (3) the reliance must be reasonable and foreseeable; and (4) the party claiming estoppel must be injured by the reliance." *Sims v. Village of Midvale,* 2012 WL 6681851, at *4 (Ohio 5th Ct.App. Dec. 18, 2012); *see also Nayyar v. Mount Carmel Health Sys.*, No. 2:10-CV-00135, 2013 WL 2418072, at *12 (S.D. Ohio June 3, 2013) *reconsideration denied sub nom. Nayyar v. Mt. Carmel Health Sys.*, No. 2:10-CV-00135, 2014 WL 619394 (S.D. Ohio Feb. 18, 2014); *Holmes v. Wilson*, No. 2:08-CV-602, 2009 WL 3673015, at *4 (S.D. Ohio Oct. 30, 2009).

Ohio courts have held that "[t]he existence or nonexistence of promissory estoppel essentially turns on the credibility of the witnesses." *Patrick v. Painesville Commercial Properties, Inc.,* 123 Ohio App. 3d 575, 586, 704 N.E.2d 1249, 1255-56 (Ohio Ct.App. 1997) (discussing promissory estoppel in the context of employment/termination claim) (internal quotations omitted); *Malempati v. Indep. Inpatient Physicians, Inc.*, No. 12AP–565, 2013 WL 4245852, at *7 (Ohio Ct. App. 2013).  Moreover, the weight to be given to the evidence and the credibility of the witnesses are issues primarily for the trier of fact.  *Patrick*, 123 Ohio App. 3d at 586 (citing *Bechtol v. Bechtol*, 49 Ohio St.3d 21, 550 N.E.2d 178, 180 (Ohio 1990).

Plaintiff asserts that summary judgment is proper on Defendant's promissory estoppel claim for three reasons.  First, Plaintiff maintains there was no "clear and unambiguous" promise because any purported promise was vague as to its essential terms and was conditioned upon both ASI's approval of product samples and "sign-off" by ASI's executives.  (Doc. 64 at 35). Second, Plaintiff insists that EL could not have reasonably relied upon any alleged promises made by Martin in her May 22, 2012 email because Defendant knew Martin alone lacked the requisite authority to make any alleged promise.  Third, Plaintiff argues that EL did not rely upon the statements EL now claims it relied on, evidenced by EL's internal emails acknowledging it never received purchase orders from ASI.  Instead, Plaintiff believes Defendant "jumped the

gun" in placing its orders with the Chinese factories, "consistent with its history of plac[ing] orders before getting customer commitment."

Defendant responds that whether promissory estoppel is appropriate turns on credibility of witnesses, making summary judgment improper.   Further, Defendant argues that Martin's May 22, 2012 email is not the only promise, commitment, or assurance ASI made to EL. Defendant also asserts that the questions of whether ASI made a "clear and unambiguous promise," whether EL relied on ASI's alleged promise, and whether EL's reliance was reasonable are all genuine issues of material fact that require denying Plaintiff's motion for summary judgment.

### 1.    Clear and Unambiguous Promise

In the context of promissory estoppel, a promise is "'a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made.'"  *Commerce Benefits Group, Inc*., 326 Fed. Appx. at 374-75 (internal citations omitted).  "It is a promise that a promisor would expect to induce reliance on the part of the promisee."  *Id.* (quoting *Casilla v. Stinchcomb,* No. E–04–041, 2005 WL 1845318, at *3 (Ohio Ct.App. July 8, 2005)); *see also McCroskey v. State,* 8 Ohio St.3d 29, 30, 456 N.E.2d 1204 (1983). This element "is not satisfied by vague or ambiguous references." *Moellering Indus., Inc. v. Nalagatla*, No. CA2012–10–104, 2013 WL 5230678, at *4.

Ohio courts have held that the question of whether a promise is "clear and unambiguous" promise is a question of fact.  *Malempati*, 2013 WL 4245852, at *7; *see also Miller v. Lindsay–Green, Inc.*, No. 04AP–848, 2005 WL 3220215, at *11 (affirming an award of damages based on a jury verdict that the plaintiff had proven the elements of promissory estoppel and finding that the "evidence supports the jury's verdict …on [plaintiff's] promissory estoppel claim").

In the case *sub judice*, whether any of the conduct and communications made by ASI representatives during May 2012 and June 2012 constituted a manifestation of intention to act – in this case, to place purchase orders and purchase the disputed top-of-bed products form EL – is a question of fact appropriate for a jury.

2.      *Reliance by the Promisee*

Under Ohio law, whether a party has established the reliance element of a promissory estoppel claim generally is a question of fact appropriate for the jury to resolve.  *See Hale v. Volunteers of America,* 158 Ohio App.3d 415, 429 ¶ 50, 816 N.E.2d 259 (Ohio App. 1 Dist.2004) (citing *Uebelacker v. Cincom Systems, Inc.,* 48 Ohio App.3d 268, 273, 549 N.E.2d 1210 (1988); *Mers v. Dispatch Printing Co.,* 19 Ohio St.3d 100, 105–06, 483 N.E.2d 150 (1985)).  Courts have recognized, however, that the reliance element can be adjudicated in summary judgment proceedings if the claimant fails to present evidence of reliance. *See, e.g., Morgan v. Del Global Technologies Corp.,* 2007 WL 3227068, *19–20 (S.D.Ohio 2007) (Rose, J.).

In its counterclaim, Defendant pleads that it relied on Plaintiff's "communications and conduct in commencing the manufacture of the Subject Merchandise."  Further, Defendant claims that "EL would not have commenced manufactured of the Subject Merchandise had it known that ASI did not intend to purchase the Subject Merchandise."  In its summary judgment briefing, Defendant elaborates, asserting that it placed orders with the factories based on assurances that the purchase orders would be signed off, and based on Defendant's understanding that the orders were needed in a hurry.  Defendant specifically points to a meeting between ASI's Nicewicz and EL's Barmucha, during which EL's Barmucha claims ASI's

Nicewicz assured him that "there was nothing to worry about" with respect to "sign-off" on and submission of the purchase orders.

Though Plaintiff's briefing raises issues relating to the existence and extent of Defendant's alleged reliance and the reasonableness of the alleged reliance, when viewing the evidence in the light most favorable to the non-movant, the Court finds that whether or not Defendant has established the reliance element of its promissory estoppel claim is a genuine issue of material fact properly submitted for resolution to the trier of fact.

### 3.     *Reasonable and Foreseeable Reliance*

Reliance cannot be reasonable where the promisor lacks authority to make such a promise, and the promisee knows or should know of the lack of authority.  *See Telxon Corp. v. Smart Media of Delaware, Inc.* 2005 WL 2292800, *23 (Ohio App.) (citation omitted) ("If the alleged promisor has no authority to make the promise, and the promisee knows or should know of that lack of authority, then promissory estoppel must fail as a matter of law. Simply put, such reliance cannot be reasonable."); *see also Piper Acceptance Corp. v. Tenex Corp.,* 1986 WL 11248, *2 (Ohio App.) (a person dealing with a known agent must acquaint himself with the extent of the agent's authority).

Plaintiff argues that, because Defendant knew "sign-off" and purchase orders were required to finalize any agreement, evidenced by the fact that Defendant inquired on multiple occasions when it would receive the purchase orders, it also knew that neither Martin nor Nicewicz had authority to promise that ASI would purchase the top-of-bed goods.  Defendant, on the other hand, claims it had no such knowledge.

In light of the extent of communications between Martin and Nicewicz and various EL representatives, and the representations made by a Martin and Nicewicz, a reasonable fact finder

could conclude that Defendant did not know, nor should it have known, that neither Martin nor Nicewicz lacked the authority to make promises on behalf of ASI, and otherwise reasonably relied on the alleged promise(s) made by Plaintiff.  Thus, the Court finds that whether or not Defendant has established that its reliance was reasonable is an issue properly submitted to the trier of fact for resolution.

## V.    CONCLUSION

For the reasons states above, Plaintiff's Motion for Summary Judgment (Doc. 64) is **GRANTED IN PART and DENIED IN PART**.

**IT IS SO ORDERED.**


___ s/ Algenon L. Marbley_____
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:  March 31, 2015**